IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | Civil Action No. 89-4340 (JBS) |
| v. | |
| HELEN KRAMER, et al., | |
| Defendant. | |
| STATE OF NEW JERSEY, DEPARTMENT OF ENVIRONMENTAL PROTECTION, | |
| Plaintiff, | Civil Action No. 89-4380 (JBS) |
| v. | |
| ALMO ANTI-POLLUTION SERVICES CORP., et al., | **OPINION** |
| Defendants. | |

APPEARANCES:

Glenn Anthony Harris, Esq.
Michael E. Brown, Esq.
BALLARD SPAHR ANDREWS & INGERSOLL
Plaza 1000
Main Street
Suite 500
Voorhees, NJ 08043
    Attorney for Third-Party Plaintiffs Rohm & Haas Company;
    E.I. duPont de Nemours & Co.; Elf-Atochem North America,
    Inc.; Cytec Industries (on behalf of American Cyanamid Co.);
    Mobil Research and Development Corp.; Chemical Leaman Tank
    Lines; Continental Can; and Carpenter Technology, Inc.

Richard F. Ricci, Esq.
LOWENSTEIN SANDLER PC
65 Livingston Avenue
Roseland, NJ 07068-1791
    Attorney for Third-Party Defendant Alumax, Inc.

**SIMANDLE,** District Judge:

## I.   INTRODUCTION

This is an extensively litigated Superfund case in which the vast majority of parties have settled and the lone claims remaining are those asserted by certain settling parties against Alumax Mill Products, Inc. ("Alumax"), the sole non-settling Defendant.  Presently before the Court are three motions: (1) the Settling Work Defendants' motion for summary judgment as to Alumax's liability as a covered party under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA") and the New Jersey Spill Compensation and Control Act (the "Spill Act") [Docket Item 1616]; (2) the Settling Work Defendants' motion for summary judgment on the issue of whether certain settling Defendants' response costs are consistent with the National Oil and Hazardous Substances Pollution Contingency Plan (the "NCP") as a matter of law [Docket Item 1603]; and (3) Alumax's motion to strike the Settling Work Defendants' expert report and for summary judgment [Docket Item 1659].  For the reasons set forth below, the Court will: (1) grant the Settling Work Defendants' motions for summary judgment as to Alumax's liability under CERCLA and the Spill Act; and (2) deny Alumax's cross-motion for summary judgment.

2

## II.  BACKGROUND

### A.   The Helen Kramer Landfill and Consent Decrees

This case arises out of consolidated actions brought by the United States and the State of New Jersey pursuant to section 107(a) of CERCLA, 42 U.S.C. § 9607(a), to recover costs incurred at the Helen Kramer Landfill (or "Landfill") in Mantua, New Jersey.  The Helen Kramer Landfill is "a major Superfund site at which the federal government and the State of New Jersey . . . incurred substantial costs . . . to remedy conditions at the landfill and its environs."  United States v. Kramer, 953 F. Supp. 592, 595 (D.N.J. 1997).

The scope of the governmental remedial efforts, the resultant cost recovery lawsuits, and eventual settlement among direct and third-party defendants have been described in multiple lengthy opinions by this Court, and are reviewed herein only to the extent necessary to address the issues raised in the motions presently before the Court.  See, e.g., id.; United States v. Kramer, 19 F. Supp. 2d 273 (D.N.J. 1998).  In brief summary:

> The Helen Kramer Landfill in Mantua Township, New Jersey, was declared a federal Superfund site and placed upon the national priorities list by the U.S. Environmental Protection Agency pursuant to the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9601, et seq.  The United States undertook the Remedial Investigation and Feasibility Study, the Remedial Design, and remedy construction, which was largely completed in 1994.  These remedial costs, together with enforcement costs and prejudgment interest to January, 1998, have amounted to approximately $123 million.  The United States commenced suit in 1989

3

to recover all response and remedial costs under Section
107(a) of CERCLA, 42 U.S.C. § 9607(a), and the government
had by 1997 filed a Third Amended Complaint against the
Direct Defendants alleged to be generators and
transporters of hazardous substances deposited at the
Landfill.  After extensive litigation and settlement
efforts, the United States and Direct Defendants reached
agreement upon a proposed Consent Decree to resolve the
United States' claims against all viable Direct
Defendants and a wide majority of the Third-Party
Defendants.

Similarly, the State DEP commenced suit in 1989 and
reached substantial agreement with a subgroup of the
Settling Defendants to enable operation and maintenance
functions at the Site to be transferred to these settling
parties in 1997. The Site had been turned over to the
NJDEP for oversight and maintenance on May 11, 1994.

Kramer, 19 F. Supp. 2d at 276-77.  The Court approved of and

entered the federal and state Consent Decrees in an Opinion and

Order dated September 3, 1998.  Id. at 289.

Pursuant to the terms of the Consent Decrees, the Settling

Work Defendants (along with the other Settling Defendants) have

paid settlement funds as reimbursement for the Government's

response costs into the Helen Kramer Landfill Superfund Site

Qualified Settlement Fund Trust (the "QSF Trust").  (U.S. Consent

Decree ¶ 4.)  Additionally, the Settling Work Defendants have

made payments to the Helen Kramer Landfill Superfund Site

Environmental Remediation Trust (the "ER Trust"), which was

established not for reimbursement of past costs, but in order to

fund future studies and investigations at the Landfill for the

EPA.  (Id.)

4

### B. Lancaster Facility's Hot Mill Waste Stream

In the sole remaining claims in the case, the Settling Work Defendants[1] have filed a claim for contribution against Alumax, a successor entity to Howmet Aluminum Corp. ("Howmet"), a company which arranged for the disposal of waste materials at the Helen Kramer Landfill. Alumax did not participate in the settlement and was not party to the Consent Decrees entered by the Court on September 3, 1998. The facts surrounding Howmet's waste disposal at the Landfill are set forth below.

During 1978 and 1979, Howmet owned and operated an aluminum processing facility located in Lancaster, Pennsylvania. (Stipulation ¶ 2.) This facility generated a hot mill process coolant waste stream (the "hot mill waste"). (Id. at ¶ 3.) Pursuant to an agreement between Howmet and a company called Jonas Waste Removal ("Jonas"), Jonas transported Howmet's hot mill waste from the Lancaster facility to the Helen Kramer Landfill, where the waste was sprayed on the roads at the Landfill for dust control. (Id. at ¶¶ 4-6.) Between 1978 and

---

[1] As the Court explained in its September 3, 1998 Opinion, the Settling Work Defendants are a subset of the parties to the Consent Decrees which agreed to "perform studies needed by [the Environmental Protection Agency] to perform its five-year reviews." Kramer, 19 F. Supp. 2d at 276. The Settling Work Defendants are: Rohm & Haas Company; E.I. duPont de Nemours & Co.; Elf-Atochem North America, Inc.; Cytec Industries (on behalf of American Cyanamid Co.); Mobil Research and Development Corp.; Chemical Leaman Tank Lines; Continental Can; and Carpenter Technology, Inc. Id. at 276 n.1.

5

1979, Jonas transported approximately 150,000 gallons of Howmet's hot mill waste to the Helen Kramer Landfill. (Id. at ¶¶ 7-8.) The parties have stipulated that Alumax is the successor to Howmet. (Id. at ¶ 1.)

While the parties appear to be in dispute as to whether two particular hazardous substances – phenol[2] and chromium[3] – were present in the hot mill waste stream, Alumax, in response to the Settling Work Defendants' Request for Admissions, has admitted

---

[2]   In particular, the Settling Work Defendants note that the laboratory analyses of the hot mill waste supplied by Alumax to the EPA indicate that phenol was present in the waste stream. (Landis Dep. Exs. 3, 5.)  The presence of phenol in the waste stream is consistent with the findings in the expert report submitted by the Settling Work Defendants.  (Third-Party Defendant's Br. Ex. A at Table 2.)  In support of its position regarding the presence of phenol in the hot mill waste, Alumax relies upon the sworn statement by Pamela Landis, former chemist for the Lancaster facility, that the waste "did not contain . . . the organic chemical, phenol."  (Landis Cert. ¶ 9.)

[3]   As to the presence of chromium in the waste stream, the Settling Work Defendants again point to the laboratory analyses of the hot mill waste supplied by Alumax to the EPA, (Landis Dep. Exs. 3, 5), and the report prepared by Conestoga-Rovers & Associates.  (Third-Party Defendant's Br. Ex. A at Table 2.)  Ms. Landis, in her deposition, testified that the elevated levels of chromium in the waste stream could have resulted from newly installed chrome plating on the work rolls at the mill, but also stated that "it's always possible that the value [measuring chromium in the waste stream] is erroneous for one reason or another."  (Landis Dep. at 75.)  In her Certification submitted in opposition to the Settling Work Defendants' motion for summary judgment, Ms. Landis appears to have settled on the latter conclusion, opining that "the analytical result for chromium . . . that was reported in a laboratory analysis by AGES Corp. in May 1977 . . . was erroneous."  (Landis Cert. ¶ 7.)  Ms. Landis makes no apparent effort to reconcile her newfound certainty with her deposition testimony about chrome plating on the work rolls at the facility.

that

> the Hot Mill Process Coolant generated by Alumax and
> transported by Jonas to the Kramer Landfill contained
> those particular chemical substances (except phenol)
> reported to be present above the analytical detection
> limits in the memorandum dated 3/27/78 from Pam Landis to
> John Hatch.  These substances included copper (0.48 ppm)
> and zinc (1.22 ppm), which are listed as hazardous
> substances by the U.S. Environmental Protection Agency,
> 40 C.F.R. Part 300, Table 302.4.  Zinc and copper are
> also included in the definition of hazardous substances
> in the New Jersey Spill Compensation and Control Act,
> N.J.S.A. § 58:10-23.11(b).

(Third-Party Plaintiffs' Br. Ex. 3 ¶ 1.)  Alumax does not dispute
that copper and zinc are among the chemicals that were found in
elevated concentrations at the Helen Kramer Landfill.  (Third-
Party Defendant's Br. Ex. A at 2.)

### C.   The Conestoga-Rovers & Associates Report

In support of their claims against Alumax, the Settling Work
Defendants submitted an evaluation of the Howmet facility's
liquid waste disposal at the Landfill, which was prepared by
Frank A. Rovers of the firm Conestoga-Rovers & Associates
("CRA").  As the report indicates, CRA relied upon records
maintained by Jonas in assessing Howmet's liquid waste disposal
to the Landfill.  (Third-Party Defendant's Br. Ex. A at 2.)  The
CRA report notes, as the parties have stipulated, that Jonas
disposed of approximately 150,000 gallons of Howmet's hot mill
waste stream at the Landfill between 1978 and 1979.[4]  (Id.)  The

_____

[4]  The CRA report notes that although in June 1978 the New
Jersey Department of Environmental Protection ("DEP") approved

CRA report indicates that the Howmet facility's liquid waste contained the chemicals copper, chromium, aluminum, zinc, phenol, and cadmium, and that these chemicals "have been observed in the leachate from the Site at concentrations exceeding that of leachate from typical municipal solid waste (MSW) landfills," and that these concentrations required remediation.  (Id. at 2, 6, Table 2.)

The CRA report articulates three opinions regarding the hot mill waste:

(1)   The liquid waste disposed by Howmet Aluminum Co. contaminated the on-Site road materials which subsequently became part of the disposed waste volume at the Site.

(2)   The contaminants disposed on the on-Site roads by Howmet Aluminum Co. are leached by rainfall and leachate with the contaminants contributing to the concentrations of chemicals migrating from the Site requiring remediation.

(3)   The disposal of liquid waste by Howmet Aluminum Co. has contributed to both the volume and chemical character of the leachate at the Site which require remediation to control environmental impacts.

(Id. at 7.)

The Court heard oral argument on the parties' cross-motions for summary judgment at a hearing convened on November 7, 2008

---

the use of waste oil for dust control at the Landfill, Jonas dispersed the Howmet waste well in excess of the 0.5 gallons per square yard of road surface authorized by the DEP.  (Third-Party Defendant's Br. Ex. A at 3.)  The report further notes that "[u]tilization of the liquid waste from Howmet as a dust suppressant does not minimize the potential for chemicals contained therein to impact the environment."  (Id. at 4.)

8

and reserved decision.

## III. DISCUSSION

### A.   Overview of Contribution Claims Under CERCLA

As the Court of Appeals recently explained, CERCLA was enacted in 1980 "to address the serious environmental and health risks posed by pollution," and the statute has two principal purposes:

> First, CERCLA is a remedial statute that grants the President broad power to command government agencies and private parties to clean up hazardous waste sites. Second, the statute requires everyone who is potentially responsible for hazardous-waste contamination to contribute to the costs of cleanup.

E.I. DuPont de Nemours and Co. v. United States, 508 F.3d 126, 128-29 (3d Cir. 2007) (internal quotations and citations omitted).

The apportionment of cleanup costs among public and private entities undertaking cleanup efforts and potentially responsible parties ("PRPs") is governed by the interplay between two of CERCLA's statutory provisions: section 107(a) and section 113(f). Section 107(a) makes four classes of "covered persons"[5] liable

---

[5]   The term "covered persons," in turn, is defined to include:

(1) the owner and operator of a vessel or a facility,

(2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,

(3) any person who by contract, agreement, or otherwise

for:

> (A) all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan;

> (B) any other necessary costs of response incurred by any other person consistent with the national contingency plan;

> (C) damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release; and

> (D) the costs of any health assessment or health effects study carried out under section 9604(i) of this title.

42 U.S.C. § 9607(a)(4)(A)-(D).

Section 113(f) provides a right of action for contribution

among PRPs:

> Any person may seek contribution from any other person who is liable or potentially liable under section 9607(a) of this title, during or following any civil action under section 9606 of this title or under section 9607(a) of this title. . . . In resolving contribution claims, the court may allocate response costs among liable parties

---

> arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and

> (4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance[.]

42 U.S.C. § 9607(a)(1)-(4).

using such equitable factors as the court determines are appropriate.

42 U.S.C. § 9613(f)(1).  Section 113(f) further provides that

> a PRP that "has resolved its liability to the United States or a State in an administrative or judicially approved settlement" will not be liable for claims for contribution from other PRPs with respect to "matters addressed in the settlement," [] § 113(f)(2); [and] a settling PRP may seek contribution from non-settling PRPs, [] § 113(f)(3)(B).

E.I. DuPont, 508 F.3d at 130.

As the Supreme Court recently clarified, with respect to the apportionment of cleanup costs among private parties,

> the remedies available in §§ 107(a) and 113(f) complement each other by providing causes of action to persons in different procedural circumstances.  Section 113(f)(1) authorizes a contribution action to PRPs with common liability stemming from an action instituted under § 106 or § 107(a).  And § 107(a) permits cost recovery (as distinct from contribution) by a private party that has itself incurred cleanup costs.  Hence, a PRP that pays money to satisfy a settlement agreement or a court judgment may pursue § 113(f) contribution.  But by reimbursing response costs paid by other parties, the PRP has not incurred its own costs of response and therefore cannot recover under § 107(a).  As a result, though eligible to seek contribution under § 113(f)(1), the PRP cannot simultaneously seek to recover the same expenses under § 107(a).

United States v. Atlantic Research Corp., --- U.S. ----, 127 S. Ct. 2331, 2338 (2007) (internal quotations and citations omitted).[6]

---

[6]  Notwithstanding the dichotomy referenced in the above-quoted passage between voluntarily incurred response costs (which are recoverable under section 107(a)) and involuntary reimbursement paid pursuant to a court judgment or settlement (for which a settling party can seek contribution from non-

**B.    Overview of Contribution Claims under the New Jersey Spill Act**

The New Jersey Spill Act "is the New Jersey environmental protection act that resembles CERCLA in its purpose, although it sets forth a distinct strict liability scheme." <u>New Jersey Turnpike Authority v. PPG Industries, Inc.</u>, 197 F.3d 96, 105 (3d Cir. 1999).  The Spill Act provides that "any person who has discharged a hazardous substance, or is in any way responsible for any hazardous substance, shall be strictly liable, jointly and severally, without regard to fault, for all cleanup and removal costs no matter by whom incurred."  N.J.S.A. 58:10-23.11g(c)(1).  In addition, section 58:10-23.11f(a)(2)

─────────────────

settling PRPs), the Supreme Court recognized that this distinction may become muddled where "a PRP . . . sustain[s] expenses pursuant to a consent decree following a suit under § 106 or § 107(a)."  <u>Atlantic Research</u>, 127 S. Ct. at 2338 n.6. The Court recognized that "[i]n such a case, the PRP does not incur costs voluntarily but does not reimburse the costs of another party," but declined to decide "whether these compelled costs of response are recoverable under § 113(f), § 107(a), or both."  <u>Id.</u>
        Citing <u>Atlantic Research</u>, the Settling Work Defendants have indicated that they intend to file a motion to amend their Complaint to assert a section 107(a) claim against Alumax in addition to their section 113(f) claim addressed herein.  In its briefs and at oral argument, Alumax indicated that it would oppose the Settling Work Defendants' motion.  The Court does not address whether under <u>Atlantic Research</u> the Settling Work Defendants may now assert a section 107(a) claim against Alumax in addition to the section 113(f) claim at issue here, but will reserve its consideration of that matter until the issue is presented in a motion for leave to amend the Complaint.  The Settling Work Defendants should file such a motion, if they wish to assert a section 107(a) claim, within fourteen (14) days of the entry of the Order accompanying this Opinion.

12

creates a private right of action in contribution for cleanup costs[7] against parties who are "in any way responsible for a discharged substance who are liable for the cost of the cleanup." N.J.S.A. 58:10-23.11f(a)(2). "The Supreme Court of New Jersey has determined that a party 'even remotely responsible for causing contamination will be deemed a responsible party under the Act,'" New Jersey Turnpike Authority, 197 F.3d at 106 (quoting In re Kimber Petroleum Corp., 110 N.J. 69 (1988)), and is properly subject to a contribution claim under section 58:10-23.11f(a)(2). See also Marsh v. New Jersey Dept. of Environmental Protection, 152 N.J. 137, 146 (1997).

**C.    Summary Judgment Motions**

The parties' cross-motions for summary judgment require the

---

[7]   "Cleanup costs" are likewise defined expansively to include:

> all direct costs associated with a discharge, and those indirect costs that may be imposed by the department pursuant to [N.J.S.A. 58:10B-2.1] associated with a discharge, incurred by the State or its political subdivisions or their agents or any person with written approval from the department in the: (1) removal or attempted removal of hazardous substances, or (2) taking of reasonable measures to prevent or mitigate damage to the public health, safety, or welfare, including, but not limited to, public and private property, shorelines, beaches, surface waters, water columns and bottom sediments, soils and other affected property, including wildlife and other natural resources, and shall include costs incurred by the State for the indemnification and legal defense of contractors pursuant to [N.J.S.A. 58:10-23.11f8 et seq.]

N.J.S.A. 58:10-23.11b.

Court to make a determination as to three issues: (1) whether the Settling Work Defendants have established that Alumax is a "covered person[]" for purposes of their section 113(f) contribution claim, pursuant to 42 U.S.C. § 9607(a) and a liable party under N.J.S.A. 58:10-23.11g(c)(1); (2) whether, for purposes of this contribution claim, the response costs that the Settling Work Defendants have incurred under the Consent Decrees are consistent with the NCP as a matter of law; and (3) whether Alumax is entitled to summary judgment as to the Settling Work Defendants' contribution claim on account of the Settling Work Defendants' failure to produce a report by an "allocation expert."  The following discussion sets forth the applicable standard of review before addressing the merits of the parties' cross-motions.

       1.   <u>Standard of Review</u>

Summary judgment is appropriate when the materials of record "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  In deciding whether there is a disputed issue of material fact, the court must view the evidence in favor of the non-moving party by extending any reasonable favorable inference to that party; in other words, "the nonmoving party's evidence 'is to be believed, and all justifiable inferences are to be drawn in [that party's] favor.'"  <u>Hunt v.</u>

14

<u>Cromartie</u>, 526 U.S. 541, 552 (1999) (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986)).  The threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." <u>Liberty Lobby</u>, 477 U.S. at 250; <u>Brewer v. Quaker State Oil Refining Corp.</u>, 72 F.3d 326, 329-30 (3d Cir. 1995) (citation omitted).

Although entitled to the benefit of all justifiable inferences from the evidence, "the nonmoving party may not, in the face of a showing of a lack of a genuine issue, withstand summary judgment by resting on mere allegations or denials in the pleadings; rather, that party must set forth 'specific facts showing that there is a genuine issue for trial,' else summary judgment, 'if appropriate,' will be entered." <u>United States v. Premises Known as 717 South Woodward Street, Allentown, Pa.</u>, 2 F.3d 529, 533 (3d Cir. 1993) (quoting Fed. R. Civ. P. 56(e)) (citations omitted).  As the Supreme Court has explained,

> Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  In such a situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.

<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986) (internal quotations and citations omitted).

15

The standard by which the court decides a summary judgment motion does not change when the parties file cross-motions. Weissman v. United States Postal Serv., 19 F. Supp. 2d 254, 259 (D.N.J. 1998). When ruling on cross-motions for summary judgment, the court must consider the motions independently, Williams v. Philadelphia House Auth., 834 F. Supp. 794, 797 (E.D. Pa. 1993), aff'd, 27 F.3d 560 (3d Cir. 1994), and view the evidence on each motion in the light most favorable to the party opposing the motion. See Matsushita Elec. Indus. Co., Ltd.  v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

     2.   Section 113(f) Contribution Claim

     "When a plaintiff proceeds under § 9613(f), the success of its contribution claim is dependent on [its capacity to establish] . . . a prima facie case of liability under § 9607(a)." Morrison Enterprises v. McShares, Inc., 302 F.3d 1127, 1135 (10th Cir. 2002) (internal quotations and citations omitted); see also New Jersey Turnpike Authority, 197 F.3d at 104 n.7. Section 113(f) thus

          envisions a two-part inquiry: First, the court must
          determine whether the defendant is "liable" under CERCLA
          § 107(a); Second, the court must allocate response costs
          among liable parties in an equitable manner. The party
          seeking contribution bears the burden of proof at both
          prongs of the court's inquiry.

Goodrich Corp. v. Town of Middlebury, 311 F.3d 154, 168 (2d Cir. 2002) (some internal quotations and citations omitted). The parties' arguments, as they bear upon each of these two steps,

16

are reviewed below.

a.    Liability of Alumax under Section 107(a)

Under the first step of a section 113(f) contribution claim, a party that incurred costs relating to the cleanup of a contaminated site pursuant to a court order or a settlement decree must establish: (1) that the party against whom the contribution claim is asserted falls within section 107(a)'s four categories of "covered persons"; (2) that there was a "release" or threatened release of hazardous substances; (3) that the release or threatened release occurred at a "facility"; (4) that the party asserting the contribution claim incurred response costs related to the release; and (5) that the response action or cleanup is consistent with the NCP.  See, e.g., United States v. Sensient Colors, Inc., --- F. Supp. 2d ----, 2008 WL 4427961, at *4 (D.N.J. Aug. 12, 2008) (citing PPG Industries, 197 F.3d at 258-59); Goodrich, 311 F.3d at 168; Morrison, 302 F.3d at 1135-36.  For the following reasons, the Court holds, under the first step of the section 113(f) inquiry, that Alumax is a liable party under section 107(a).

First, the undisputed facts of record establish that Alumax is a "covered person" under section 107(a).  Under CERCLA, "covered persons" include "any person who by contract . . . arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous

17

substances owned . . . by such person, by any other party or
entity, at any facility . . . owned or operated by another party
or entity and containing such hazardous substances."  42 U.S.C. §
9607(a)(3).  There is no dispute among the parties that Howmet
contracted with Jonas for the disposal of its Lancaster
facility's hot mill waste at the Helen Kramer Landfill.
(Stipulation ¶¶ 4-6.)  There is likewise no dispute that this
waste contained hazardous substances that were found in high
concentrations at the Landfill, including copper and zinc.
(Third-Party Plaintiffs' Br. Ex. 3 ¶ 1.)  Finally, Alumax does
not deny that it is the successor entity to Howmet.  See United
States v. General Battery Corp., Inc., 423 F.3d 294, 298 (3d Cir.
2005) (noting that "it is now settled that CERCLA incorporates
common law principles of indirect corporate liability, including
successor liability").

     The record likewise is sufficient to demonstrate as a matter
of law that Alumax is responsible for the "release" of hazardous
substances at a "facility."  As the Court noted, supra, Howmet
contracted for the disposal of hazardous substance-containing
waste at the Landfill.  Alumax does not appear to deny that such
a disposal constitutes a "release," or that the Helen Kramer
Landfill is a "facility," under CERCLA.[8]  Instead, Alumax focuses

---

     [8]  Under CERCLA, "release" is defined as "any spilling,
leaking, pumping, pouring, emitting, emptying, discharging,
injecting, escaping, leaching, dumping, or disposing into the

on the disputed evidence regarding the precise chemical makeup of
the hot mill waste, emphasizing its disagreement with the
Settling Work Defendants' assertions that the waste contained
phenol and chromium;[9] as Alumax argues, "[t]hese factual
deficiencies in the Motion are of particular significance because
[Alumax] has a strong divisibility defense to liability under
CERCLA." (Third Party Defendant's Br. at 6.)

    Alumax's invocation of such a defense is misplaced. "While
the 'divisibility' defense to joint and several liability is
frequently invoked in cost recovery actions brought under §
107(a), it is not a defense to a contribution action under §
113(f)." Redwing Carriers, Inc. v. Saraland Apartments, 94 F.3d
1489, 1513 (11th Cir. 1996) (cited approvingly in New Castle
County v. Halliburton NUS Corp., 111 F.3d 1116, 1122 n.6 (3d Cir.
1997)). Alumax's argument that the hot mill waste contained
some, but not all, of the hazardous substances identified by the
Settling Work Defendants will be of relevance to the Court's
equitable considerations under section 113(f), see Beazer East,
Inc. v. Mead Corp., 412 F.3d 429, 447 (3d Cir. 2005), but in
light of Alumax's admissions concerning the presence of copper
and zinc in the waste, (Third-Party Plaintiffs' Br. Ex. 3 ¶ 1),

environment . . ." subject to certain exceptions not applicable
here. 42 U.S.C. § 9601(22). CERCLA expressly includes
"landfill" within the definition of "facility." § 9601(9).

    [9] See Notes 2 and 3, supra.

19

the Settling Work Defendants have established that Alumax is
responsible for the release of hazardous substances as a matter
of law.

Finally, the Court holds that the response costs incurred,
and response actions taken, by the Settling Work Defendants
pursuant to the consent decrees are consistent with the NCP.[10]
Courts have recognized that "[t]he burden on a private party to
show compliance with the NCP in order to make out its prima facie
case under § 9607(a) is ordinarily not an easy one, but the EPA
regulations have made that job much easier in certain
situations." Morrison, 302 F.3d at 1136.  In particular, 40
C.F.R. § 300.700(c)(3) provides that "[f]or the purpose of cost
recovery under section 107(a)(4)(B) of CERCLA[,] . . . [a]ny
response action carried out in compliance with the terms of . . .
a consent decree entered into pursuant to section 122 of CERCLA,
will be considered 'consistent with the NCP.'"  As many courts
have recognized, this provision creates "an irrebuttable
presumption of consistency with the NCP when a private-party
response action is 'carried out in compliance with' the terms of
an EPA order or consent decree." United States v. Atlas Lederer
Co., 282 F. Supp. 2d 687, 699 (S.D. Ohio 2001); see also

---

[10]   The NCP "is a long and detailed list of procedures that
must be carried out by federal and state governments when they
are responding to hazardous waste releases." Morrison, 302 F.3d
at 1136.

Morrison, 302 F.3d at 1136; United States v. Atlas Minerals and Chemicals, Inc., No. 91-5118, 1995 WL 510304, at *104 (E.D. Pa. Aug. 22, 1995).

While Alumax opposes the Settling Work Defendants' motion for summary judgment as to whether their reimbursement of the Government's cleanup costs pursuant to the consent decrees was consistent with the NCP, there does not appear to be a dispute between the parties that the Settling Work Defendants' ongoing remediation efforts are "response action[s] carried out in compliance with the terms of . . . a consent decree." 40 C.F.R. § 300.700(c)(3). The Court agrees, and, pursuant to section 300.700(c)(3), finds that the Settling Work Defendants' response actions compelled by the consent decrees are consistent with the NCP as a matter of law.

Additionally, for the following reasons, the Court agrees with the Settling Work Defendants that Alumax is foreclosed from contesting, at this stage of the litigation, whether the cleanup actions taken by the Government, for which the Settling Work Defendants paid reimbursement costs pursuant to the consent decrees, were consistent with the NCP. As this Court has previously noted, unlike the response actions of private parties, "[w]hen the government is seeking response costs, . . . consistency with the NCP is presumed unless defendant can overcome this presumption by presenting evidence of

21

inconsistency." United States v. Kramer, 913 F. Supp. 848, 862
(D.N.J. 1995) (quoting United States v. Hardage, 982 F.2d 1436,
1442 (10th Cir. 1992)).  A party challenging the consistency of
the Government's cleanup actions with the NCP, as Alumax seeks to
do here, bears the heavy burden of proving that the Government's
response actions were arbitrary and capricious.  See, e.g.,
Hardage, 982 F.2d at 1442; United States v. E.I. du Pont de
Nemours & Co., Inc., 341 F. Supp. 2d 215, 232 (W.D.N.Y. 2004).
Alumax has failed to identify a single response action taken by
the Government that meets this standard, but argues that it
retains the right to challenge the consistency of the
Government's cleanup efforts with the NCP.

     At this stage in this case, after the extensive, arms-length
settlement negotiations between the settling parties and after
the Court found, in a lengthy Opinion, that the consent decrees
were "faithful to CERCLA," Kramer, 19 F. Supp. 2d at 283,
Alumax's position – that the Government, the settling Defendants,
and the Court collectively sanctioned arbitrary and capricious
governmental response actions – is untenable.  All parties in
this case, including the Settling Work Defendants and Alumax, had
every incentive over the course of the substantial data gathering
and settlement negotiations to identify any response actions for
which the Government sought reimbursement that were inconsistent
with the NCP.  Cf. United States v. Rohm & Haas Co., Inc., No.

85-4386, 1999 WL 33524231, at *2 (D.N.J. Aug. 10, 1999) (noting that "Third-Party Plaintiffs clearly were motivated to protect their own interests by ensuring that they reimbursed the government only for its recoverable response costs").  Alumax, which was served with the consent decrees and given the opportunity to lodge any objections regarding the Government's cleanup efforts in 1998, see Kramer, 19 F. Supp. 2d at 277, raised no such objection.  In fact, no party to the negotiations herein (including settling parties with every incentive to reimburse only those costs that the Government could recover under section 107(a)) identified any inconsistency between the Government's actions and the NCP; as the Court observed in approving the consent decrees, "the technical adequacy of the remediation under this settlement is not in question."  Id. at 287.  Surely if the costs for which the Government sought reimbursement were arbitrarily and capriciously incurred, at least one among the "crew of sophisticated players, with sharply conflicting interests" would have so indicated.[11]  Id. at 281

---

[11]  This Court explained the heavy burden a party must bear when challenging the consistency of the Government's cleanup actions with the NCP in United States v. Kramer, 913 F. Supp. 848 (D.N.J. 1995).  The Court explained that "arguments that individual response costs are unreasonable, excessive, duplicative, improper, and not cost-effective, as a matter of law, do not allege inconsistency with the NCP and do not provide any defense in a cost recovery action."  Id. at 867.  A party alleging NCP inconsistency must instead demonstrate that the Government's response costs were incurred through "fraud, double-billing or activities that do not relate to the lawful

(quoting <u>United States v. Cannons Engineering Corp.</u>, 899 F.2d 79, 84 (1st Cir. 1990)).

Moreover, it cannot be overlooked that while the Government expended $123 million in remedial and enforcement costs arising out of the Helen Kramer Landfill, it settled its claims with the Settling Defendants for $95 million, or approximately 77 cents for every dollar spent on its cleanup efforts.  <u>Id.</u> at 276.  All efforts undertaken by the Government were disclosed and available to Alumax in the document depository maintained in this case, and the Government's documents were also available for public inspection during the public comment period.  Alumax, which has not identified a single arbitrary and capricious element in the United States' response actions, would thus have to establish that nearly one-quarter of the Government's response costs – or $28 million – were arbitrarily and capriciously incurred by the Government in order to challenge the consistency of the Government's response actions with the NCP for which the Settling Work Defendants seek contribution.[12]  Again, the Court finds such

_____

remedy."  <u>Id.</u>  As the Court noted, <u>supra</u>, if any of the Government's response costs were incurred as a result of such illegitimate activities, the parties to the settlement negotiations (including Alumax) had every incentive to bring such considerations to light.

[12]  Nor, for that matter, has Alumax submitted an affidavit pursuant to Rule 56(f), Fed. R. Civ. P., suggesting that "it cannot present facts essential to justify its opposition" to the Settling Work Defendants' summary judgment motion.

a prospect untenable at this stage of this case.

Alumax argues that if summary judgment is entered as to the consistency of the Government's response actions with the NCP, it will be placed in a worse position viz a viz the Settling Work Defendants than the Settling Defendants would themselves have faced against Government had they elected not to settle their claims. That is, whereas the Settling Work Defendants would have been entitled at trial to rebut the presumption of consistency between governmental cleanup actions and the NCP, Alumax, in the post-settlement setting, is denied that opportunity in responding to the Settling Work Defendants' contribution claim. That may indeed be the case, but such an outcome is not uncommon in CERCLA jurisprudence, where the statutory goal of providing incentives for "encouraging settlements" is widely recognized. In re Tutu Water Wells CERCLA Litigation, 326 F.3d 201, 207 (3d Cir. 2003) (citation omitted).

For these reasons, the Court concludes that the Settling Work Defendants are entitled to summary judgment on the matter of Alumax's liability under CERCLA.

### b. Equitable Allocation

Under section 113(f), once the Court has determined that the third-party defendant is liable under section 107(a), see Goodrich, 311 F.3d at 168, the court "may allocate response costs among liable parties using such equitable factors as the court

25

determines are appropriate."  42 U.S.C. § 9613(f)(1).  As the

Court of Appeals has made clear, section 113(f) enables courts to

consider a wide range of factors when allocating PRPs' equitable

shares:

> Courts examining this language and its history have
> concluded that Congress intended to grant the district
> courts significant flexibility in determining equitable
> allocations of response costs, without requiring the
> courts to prioritize, much less consider, any specific
> factor.  In a leading case, the Seventh Circuit Court of
> Appeals explained that "the language of section 9613(f)
> clearly indicates Congress's intent to allow courts to
> determine what factors should be considered in their own
> discretion without requiring a court to consider any
> particular list of factors." Environmental Transportation
> Systems, Inc. v. ENSCO, 969 F.2d 503, 508 (7th Cir.
> 1992); see also United States v. R.W. Meyer, Inc., 932
> F.2d 568, 576-77 (6th Cir. 1991) (reasoning that section
> 9613(f)(1)'s language "confirms the legislative intent to
> grant courts flexibility in exercising their discretion")
> (citations to legislative history omitted).  As we have
> held, "a court may consider several factors or a few,
> depending on the totality of the circumstances."  New
> Jersey Turnpike Authority v. PPG Industries, Inc., 197
> F.3d 96, 104 (3d Cir. 1999) (citation omitted).

Beazer East, 412 F.3d at 446.  While the "Gore Factors"[13]

---

[13]  The Gore factors include:

1. the ability of the parties to demonstrate that their
contribution to a discharge, release or disposal of a
hazardous waste can be distinguished;

2. the amount of the hazardous waste involved;

3. the degree of toxicity of the hazardous waste
involved;

4. the degree of involvement by the parties in the
generation, transportation, treatment, storage, or
disposal of the hazardous waste;

frequently play a central role in courts' section 113(f) determinations, courts' analyses have not been restricted to the Gore factors.[14]

---

5. the degree of care exercised by the parties with respect to the hazardous waste concerned, taking into account the characteristics of such hazardous waste; and

6. the degree of cooperation by the parties with the Federal, State or local officials to prevent any harm to the public health or the environment.

Lenox Inc. v. Reuben Smith Rubbish Removal, 91 F. Supp. 2d 743, 747 (D.N.J. 2000).

[14]   For example, in Environmental Transp. Systems, Inc. v. ENSCO, Inc., 969 F.2d 503 (7th Cir. 1992), which the Court of Appeals for the Third Circuit cited approvingly in Beazer East, the court set forth a wide range of factors that courts may consider in a section 113(f) action:

Like the Court of Appeals for the Sixth Circuit, we think a court may consider any factors appropriate to balance the equities in the totality of the circumstances. See United States v. R.W. Meyer, Inc., 932 F.2d 568 (6th Cir. 1991). And as examples, we catalog several federal court decisions listing factors to be possibly considered under section 9613(f)(1): B.F. Goodrich Co. v. Murtha, 958 F.2d 1192 (2d Cir. 1992) (court may consider an array of factors including the financial resources of the parties involved); CPC International, Inc. v. Aerojet-General Corp., 777 F. Supp. 549 (W.D. Mich. 1991) (listing responsible party's degree of involvement in disposal of hazardous waste, amount of hazardous waste involved, and degree of care exercised by the parties as factors to consider in a contribution action); Weyerhaeuser Co. v. Koppers Co., 771 F. Supp. 1420, 1426 (D. Md. 1991) (indicating as important factors the benefits received by the parties from contaminating activities and the knowledge and/or acquiescence of the parties in the contaminating activities); and United States v. Bell Petroleum Services, Inc., (available on Westlaw ELR database), 1990 U.S. Dist. LEXIS 14066, *9 (W.D. Tex. July 24, 1990) (court is not limited to apportionment in a contribution action on the basis of fault).

In its motion for summary judgment as to the Settling Work
Defendants' contribution claim, Alumax argues that without the
report and testimony of an "allocation expert," the Settling Work
Defendants cannot prevail on their claim.  According to Alumax,
the CRA report affords an insufficient basis for the Court to
determine Alumax's equitable share of the response costs because
it fails to quantify the "share of liability or harm at Kramer"
attributable to Alumax; as Alumax argues, "[t]he spraying on the
roads of the Alumax coolant, containing no migratory indicator
pollutants, cannot be measured in the Kramer universe of so many
migratory chemical pollutants in such huge volumes and
concentrations, dumped into pits in proximity to groundwater."
(Third-Party Defendant's Br. at 4.)

The Court will deny Alumax's motion for summary judgment.
Initially, it should be recognized that because "CERCLA's
allocation scheme is an equitable determination, in which the
district court must make its own factual findings and legal
conclusions," Control Data Corp. v. S.C.S.C. Corp., 53 F.3d 930,
938 (8th Cir. 1995), while "expert testimony might illuminate the
court's consideration of equitable factors, balancing those
factors to arrive at an equitable allocation is an essentially
judicial function."  Chitayat v. Vanderbilt Associates, No.

_____

969 F.2d at 509.

03-5314, 2007 WL 2890248, at *6 (E.D.N.Y. Sept. 27, 2007).  To
the extent that Alumax argues that the Settling Work Defendants
cannot survive summary judgment without an "allocation expert,"
this argument fails as a matter of law.  The Settling Work
Defendants will be required, of course, to present evidence
sufficient for the Court to determine the parties' equitable
shares of the response costs, but there is no requirement that
such evidence be presented through the testimony of an
"allocation expert."  See id.  Upon summary judgment, where
justifiable inferences must be drawn in the non-movant's favor,
the Court cannot presume that the Settling Work Defendants will
be unable to meet their burden solely by virtue of the claimed
inadequacies in testimony that itself is not necessary as a
matter of law.  Cf. ENSCO, 969 F.2d at 509-10 ("Because
allocation of cleanup costs can be based on many equitable
factors on which there may be much competing evidence leading to
material issues of fact, the issue of contribution may not always
be suited to disposition by summary judgment.").

     Moreover, the Court finds that the contents of the CRA
report are not as inadequate as Alumax suggests.  The report
serves as a basis for the Court to determine the number of
gallons of hot mill waste deposited at the site, the types of
hazardous substances contained in the waste and the
concentrations of such substances, and the extent to which the

29

hazardous substances contained in the waste were also found in the Helen Kramer Landfill.  (Third-Party Defendant's Br. Ex. A at 7.)  In addition to this data, the Settling Work Defendants are presumably in possession of data bearing upon the comparative impact of the settling PRPs on the conditions at the Landfill. See Kramer, 19 F. Supp. 2d at 278 (describing the settlement process leading to the entry of the consent decrees and noting that "[t]he purpose of this process was to reach a fair and reasonable allocation of potential liability among some 300 potentially responsible parties in an ADR process which would create a reliable data base and apply reasonable assumptions regarding the comparative impact of each party's waste stream to the Helen Kramer Landfill . . . . [A]ll participants [responded] . . . to a detailed common questionnaire[,] answers [to which] were placed into a common repository, available for review by all participants.")  Such data, along with the CRA report, will presumably facilitate the Court's determination of the relative responsibility of Alumax as compared to the remaining PRPs.  See Akzo Nobel Coatings, Inc. v. Aigner Corp., 197 F.3d 302, 308 (7th Cir. 1999) (upholding section 113(f) allocation based upon "an approach treating each gallon of solvents as equally responsible for cleanup costs").

Similarly, to the extent that Alumax appears to argue that the Court cannot render a section 113(f) allocation in the

absence of expert testimony that disentangles with precision the toxicity of each PRP's releases at the Landfill, there is no requirement in CERCLA that a court's section 113(f) determinations be made according to a "toxicity index."  <u>Id.</u> at 304.  As the extensive list of allocation considerations set forth in Note 20, <u>supra</u>, indicate, no single factor in the contribution analysis is determinative – "a court may consider any factors appropriate to balance the equities in the totality of the circumstances."  <u>ENSCO</u>, 969 F.2d at 509.

The Court will accordingly deny Alumax's motion for summary judgment and to strike the report of the Settling Work Defendants' expert.

### 3.   <u>Spill Act Contribution Claim</u>

Finally, the Court will grant the Settling Work Defendants' motion for summary judgment as to Alumax's liability under the New Jersey Spill Act.  As with their motion for summary judgment as to the question of liability under CERCLA, the Settling Work Defendants are not, in this motion, seeking a determination of the specific costs that are or are not recoverable from Alumax, but are simply seeking a determination by this Court that Alumax is responsible as a discharging party under the Spill Act.  As the Court explained, <u>supra</u>, liability under the Spill Act attaches to "[a]ny person who has discharged a hazardous substance, or is in any way responsible for any hazardous

31

substance." N.J.S.A. 58:10-23.11g(c)(1); <u>see</u> <u>Marsh</u>, 152 N.J. at 146 (noting that the Spill Act in general, and this language in particular, are to be "liberally construed"); <u>see</u> <u>also</u> <u>New Jersey Turnpike Authority</u>, 197 F.3d at 106 (noting that "[t]he Supreme Court of New Jersey has determined that a party 'even remotely responsible for causing contamination will be deemed a responsible party under the Act'") (quoting <u>In re Kimber</u>, 110 N.J. at 85).

As the analysis of Alumax's status as a "covered party" under CERCLA makes clear, <u>supra</u>, Alumax is responsible for the discharge of hazardous substances, including the copper and zinc contained in the hot mill waste, at the Helen Kramer Landfill. (Third-Party Plaintiffs' Br. Ex. 3 ¶ 1.)  Indeed, counsel for Alumax indicated at the November 7, 2008 hearing that Alumax does not contest that it is responsible for such a discharge.  The Settling Work Defendants are accordingly entitled to summary judgment as to the issue of Alumax's liability under the Spill Act.  As with the CERCLA claim, the ultimate allocation among the Settling Work Defendants and Alumax is a matter for the Court to determine "using such equitable factors as the court determines are appropriate," N.J.S.A. 58:10-23.11f(a)(2)(a), but as to the matter of liability, summary judgment will be entered in the Settling Work Defendants' favor.

**IV.   CONCLUSION**

For the reasons discussed above, the Court will grant the Settling Work Defendants' motions for summary judgment as to Alumax's liability under CERCLA and the Spill Act, and deny Alumax's cross-motion for summary judgment.  The accompanying Order will be entered.


**November 19, 2008**                          **s/ Jerome B. Simandle**
Date                                             JEROME B. SIMANDLE
                                                 United States District Judge